UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-20124-CR-UNGARO/OTAZO-REYES

UNITED STATES OF AMERICA,

v.

JERMAINE LINARD RAGIN,

   Defendant.
_____/

### REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendant Jermaine Linard Ragin's ("Ragin" or "Defendant") Motion to Suppress Physical Evidence and Statements (hereafter, "Motion to Suppress") [D.E. 16]. This matter was referred to the undersigned by the Honorable Ursula Ungaro, United States District Judge, pursuant to Title 28, United States Code, Section 636 [D.E. 17]. The undersigned held an evidentiary hearing on this matter on April 27, 2016. For the reasons stated below, the undersigned respectfully recommends that Ragin's Motion to Suppress be DENIED.

### PROCEDURAL BACKGROUND

On February 26, 2016, Ragin was charged with committing the following offenses on or about November 13, 2015:

   **COUNT 1:**  Possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

   **COUNT 2:**  Possession of cocaine and marijuana with intent to distribute them, in violation of 21 U.S.C. § 841(a)(1).

   **COUNT 3:**  Possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

See Indictment [D.E. 8].

Ragin seeks to suppress the firearm, ammunition, and drugs underlying the indictment, as well as incriminatory statements made by him, on the grounds that they were derived from an unlawful search and seizure. Ragin argues that the arresting police officer from the Florida City Police Department ("FCPD") did not have probable cause to search or seize him and that all physical evidence obtained and all statements made by him were the direct, unattenuated result of the unlawful search and seizure.

In opposition to the Motion to Suppress, the government argues that the police officer was justified in seizing some of the narcotics and the firearm because they were in plain view. The government also argues that the officer had probable cause to arrest Ragin based on the readily apparent smell of the marijuana, and to search and seize all of the narcotics and the firearm incident to Ragin's arrest. Finally, the government argues that, because Ragin's statements were spontaneous, they could not be the product of an illegal search and seizure.

## STANDARD OF REVIEW

**1.    The Plain View Doctrine**

The Fourth Amendment protects "the people" from "unreasonable searches and seizures." U.S. Const. amend. IV. However, "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Payton v. New York, 445 U.S. 573, 587 (1980). See also United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006) (The plain view doctrine allows a warrantless seizure where "(1) an officer [was] lawfully located in the place from which the seized object could be plainly viewed and [had] a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.").

### 2. Probable Cause and Search Incident to Arrest

"Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." United States v. Jimenez, 780 F.2d 975, 978 (11th Cir. 1986).

"A search limited to the suspect's grab area is always allowed incident to a lawful arrest, even if the officers have no search warrant and no reason to believe there is evidence or a weapon in the area." United States v. Moreno, 559 F. App'x 940, 944 (11th Cir. 2014). See also United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987) ("A search incident to arrest is always allowed of the suspect's person and the immediate area from which the suspect can grab a weapon or destroy evidence.").

### 3. Spontaneous Statements

"[T]he absence of *Miranda* warnings would not preclude the admission of a spontaneous statement." United States v. Jules, 244 F. App'x 964, 972 (11th Cir. 2007); see also United States v. Glen-Archila, 677 F.2d 809, 814 (11th Cir. 1982) (same).

### 4. Fruit of the Poisonous Tree

Under the long established exclusionary rule, "evidence seized during an unlawful search [can] not constitute proof against the victim of the search." Wong Sun v. United States, 371 U.S. 471, 484 (1963) (citing Weeks v. United States, 232 U.S. 383 (1914)). "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." Id. at 484-85 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)). Moreover, the exclusionary rule applies equally to physical and verbal evidence. Id. at 486. As further explained by the Supreme Court, not "all evidence is fruit of the poisonous tree simply because it

would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 487-88 (citation omitted).

## FINDINGS OF FACT

### A. Credibility Determination

1. The arresting FCPD officer, Corporal Ken Armenteros ("Corporal Armenteros"), was the sole witness at the April 27, 2016 evidentiary hearing. Notwithstanding Defendant's contention that Corporal Armenteros' entire version of the events was suspect and not worthy of credence, the undersigned finds that his testimony was clear, unbiased, and internally consistent; that it comported with the contemporaneous police reports; and that it was credible.

### B. Facts

2. Corporal Armenteros has served in the FCPD for the past three and a half years. During his prior service in the military, he was attached to the Drug Enforcement Administration ("DEA"). He received training in identification of narcotics and worked in counter-narcotics operations.

3. On November 13, 2015, after returning from lunch, Corporal Armenteros and FCPD Chief Taylor drove in an unmarked police vehicle to the dedicated bus lane running along the northwest sector of Florida City to engage in community policing.[1] FCPD had received reports that migrant workers using the express bus service were being robbed while waiting for the bus and Chief Taylor wanted to engage the workers and assure them of police presence in the

---

[1] Although the vehicle (a Ford Expedition) was not marked as a police car, it was equipped with flash lights and sirens.

4

area.

4.  When they arrived at the bus lane, the officers noticed two people waiting for the bus and Corporal Armenteros got out of the police vehicle to speak to them. At that time, a black male approached Corporal Armenteros and said that the officers were in the wrong area, that they should go around the corner where there was a group of males selling narcotics, that one of them had a weapon, and that they would see a black male with dreads in front of "the yellow houses." By the description, Corporal Armenteros knew the area to be 13th Street in the northwest section of Florida City, a couple of minutes away from the bus lane.

5.  Corporal Armenteros asked the black male if he had any more information to provide, but the individual appeared nervous and not wanting to talk further and walked off.

6.  Corporal Armenteros then got back into the police vehicle with Chief Taylor and they drove around the fence that divides the dedicated bus lane from the city and headed towards 13th Street, which was right around the corner, two minutes away.

7.  As the officers drove along 13th Street heading west at less than five miles per hour, Corporal Armenteros saw a group of black males approximately 10 to 15 feet away, who were congregating outside one of the yellow houses (hereafter, "the house"). The house has a sidewalk along the side, leading to the entrance door. See Gov't Ex. 1.[2]

8.  The group that Corporal Armenteros saw was composed of two black males standing towards the front of the house; a heavy set black male with dreads sitting by the entrance door on the side of the house; and Ragin a couple of feet away sitting on a chair behind

---

[2] The picture shown on Government Exhibit 1 was taken after the events by Corporal Armenteros. The government provided additional images of the house and its surroundings from April 2011, when "the yellow houses" were painted different colors. See also Gov't Exs. 2 & 3.

5

them.[3]

9. Corporal Armenteros pulled up to the house and parked the police vehicle heading west on the same side of the street as the house, with the passenger side window closest to the house. At that time, Corporal Armenteros saw Ragin reach with his right hand for an open silver can that was on the patch of grass next to him and conceal an unknown object. See Gov't Ex. 4.[4]

10. Corporal Armenteros then got out of the driver's side of the police vehicle, went around the front of the vehicle and started walking towards Ragin, all the while maintaining an unobstructed line of sight to both Ragin and the cans that were next to him. As he did so, Corporal Armenteros perceived a strong odor of fresh marijuana, which became stronger as he got closer to Ragin.

11. Corporal Armenteros stopped when he got within two feet of Ragin, south of him and a little bit to his left, and three feet away from the cans.[5] Corporal Armenteros saw that the silver can had a bunch of baggies of marijuana in it.

12. Corporal Armenteros then took a step back to scan Ragin's body in preparation to arrest him. Ragin was wearing camel shorts, a tank top and sandals, and was still sitting down. Corporal Armenteros saw sticking out of the left pocket of Ragin's shorts, which pocket was loose due to Ragin's sitting position, the magazine and handle of a black handgun. See Gov't

---

[3] Corporal Armenteros marked the locations of the individuals on Defendant's Exhibit 1, with the numbers 3 and 4 indicating the two black males who were standing by the front of the house; the number 1 indicating the heavy set man with dreads sitting on the concrete porch by the entrance door facing away from the house; and the initials "JR" indicating Ragin sitting past the door facing towards the front of the house, with his chair half on the sidewalk and half on the patch of grass next to the house. See Def's Ex. 1. Corporal Armenteros testified that the trash cans that appear in Defendant's Exhibit 1 just behind the entrance door were not in that location on November 13, 2015.

[4] Corporal Armenteros later recovered the open silver can and its blue lid and a yellow can that was covered with a yellow lid from the scene. See Gov't Exs. 4, 5 & 6. Corporal Armenteros marked the location of the two cans with the letters "CC" on Defendant's Exhibit 1, showing them to be on the grass to the right of Ragin, by a pipe attached to the wall of the house. See Def's Ex. 1.

[5] Corporal Armenteros marked his location on Defendant's Exhibit 1 with his initials and the number 1. See Def's Ex. 1.

6

Ex. 7 (showing recovered Smith & Wesson hand gun and ammunition).

13. At that point, Corporal Armenteros took another step back, drew his weapon, said "gun," and told Ragin to stand up and that he was under arrest. Ragin did not immediately comply, so Corporal Armenteros escalated his command. Ragin then stood up and, as he did, the weapon fell out of his left shorts pocket and hit the concrete sidewalk, making a loud noise. The gun landed about one foot behind Ragin.

14. As Corporal Armenteros ordered Ragin to get down to the ground, Ragin spontaneously said, "That's it, you got me, I don't have any more guns."

15. Once Ragin got down on the ground, with his feet facing north, Corporal Armenteros handcuffed him and placed him in custody. Corporal Armenteros searched Ragin incident to his arrest while he was on the ground and found $264 in currency and two baggies of marijuana in his right shorts pocket.

16. The other males in the group were, in the words of Corporal Armenteros, "panicking" and "freaked out" and put their hands up in the air.

17. Corporal Armenteros secured the gun and the two cans and took them to the police vehicle at the same time he escorted Ragin to the vehicle. He placed the cans on the front seat, the gun in the glove compartment, and Ragin on the back seat.

18. The silver can contained 28 baggies of marijuana and the yellow can contained 10 baggies of marijuana and 13 baggies of cocaine. See Gov't Exs. 8, 9 & 10.[6]

19. The heavy set male with the dreads was found to be in possession of a bag of marijuana and was arrested for possession of marijuana. The two other males were arrested for loitering and prowling. None of the four males were residents of the house.

---

[6] The pictures in Government's Exhibits 4 through 10 were taken by Corporal Armenteros at the police station.

20. At some point after his arrest, Ragin also spontaneously said, "Don't worry about this rookie; my attorney is going to beat all your charges; I have money."

21. As part of his investigation, Corporal Armenteros made contact with the adults inside the house, who said that they did not know any of the four males, did not have anything do with them, and did not want to talk to the officer.

22. The narratives contained in the Arrest Affidavit and the Offense Incident Report that Corporal Armenteros completed on November 13, 2015 comport with and corroborate the officer's testimony at the April 27, 2016 hearing. See Gov't Exs. 11 & 12.

23. The total amount of marijuana contained in the 38 baggies that were in the two cans was 28.4 grams. See Gov't Ex. 12.[7] This equates to approximately .75 grams per baggie. Thus, the amount of marijuana in the open silver can was approximately 21 grams. Notwithstanding Defendant's credibility challenge, the undersigned accepts Corporal Armenteros' testimony that he could perceive a strong odor of marijuana emanating from the baggies in the open silver can, given his narcotics training and experience.

24. Defendant also challenged Corporal Armenteros' credibility on the grounds that the officer omitted any mention of Chief Taylor in his Arrest Affidavit and the Offense Incident Report.[8]

25. Corporal Armenteros offered as his reason for the omission that Chief Taylor was not involved in Ragin's arrest. Corporal Armenteros testified that Chief Taylor was behind him as he walked towards the group of males and marked on Defendant's Exhibit 1 with the letter "T" the position where Chief Taylor ultimately stood, which was on the sidewalk, north of Corporal Armenteros. See Def's Ex. 1. Corporal Armenteros did not provide any testimony that

---

[7] The figure of 28 baggies for this amount in the Arrest Affidavit appears to be a scrivener's error.
[8] Corporal Armenteros only mentioned Officer Rodriguez, who assisted with transporting Ragin to the police station and with searching the other males in the group.

Chief Taylor took any action beyond following him down the sidewalk and then standing to the north of him.[9] Given these facts, the undersigned does not find that the omission of Chief Taylor from the police reports diminishes the credibility of Corporal Armenteros' testimony.

## **CONCLUSIONS OF LAW**

Based on the foregoing factual findings and legal authorities, the undersigned concludes as follows.

First. Contrary to Defendant's position at the April 27, 2016 hearing, the undersigned does not find that Ragin and the other three males were "seized" the minute Corporal Armenteros got out of the police vehicle and walked up to the house. Even though nobody moved, this was not a result of any command by Corporal Armenteros. Hence, there was no *Terry* stop in this case. United States v. Williams, 876 F.2d 1521, 1523 (11th Cir. 1989) (Without violating the Fourth Amendment, police officers "may stop and briefly detain a person to investigate a reasonable suspicion that he is involved in criminal activity, even though probable cause is lacking") (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

Second. Corporal Armenteros was justified in seizing the narcotics in the silver can and the firearm under the plain view doctrine. In this regard, the undersigned finds that the two requirements for application of the plain view doctrine apply. Smith, 459 F.3d at 1290 (The plain view doctrine allows a warrantless seizure where "(1) an officer [was] lawfully located in the place from which the seized object could be plainly viewed and [had] a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent."). As

---

[9] Corporal Armenteros testified that he and Chief Taylor did speak about the case and about what charges should the FCPD bring against the four individuals when they were on their way back to the police station.

to the first requirement, Corporal Armenteros lawfully walked up to the house[10] and observed in plain view the baggies of marijuana in the open silver container and the handle and magazine of the gun sticking out of Ragin's loose shorts pocket.  As to the second element, the incriminating character of the narcotics and gun were immediately apparent, given that marijuana is an illicit drug, that there were a bunch of baggies in the silver can, indicating that drug transactions were taking place, and that it is illegal to possess a gun during the course of a drug transaction.

Third. Corporal Armenteros had probable cause to arrest Ragin based on his perception of a strong odor of marijuana once he got out of the police vehicle; his observation of marijuana in the silver can, and his observation of the gun both in Ragin's pocket and after it fell to the ground.  Jimenez, 780 F.2d at 978.  And Corporal Armenteros had probable cause to search the person of Ragin and the area within his wing span incident to his arrest.  Moreno, 559 F. App'x at 944; Standridge, 810 F.2d at 1037.  Therefore, the search and seizure of the narcotics in the silver and yellow cans, the gun and ammunition, and the drugs and currency on Ragin's person was not illegal.

Fourth. Ragin's two statements are not subject to suppression because they were spontaneous.  Jules, 244 F. App'x at 972; Glen-Archila, 677 F.2d at 814.

Fifth. The items seized from Ragin and his statements are not excludable as fruits of the poisonous tree because they were not the product of an illegal search and seizure.  Wong Sun, 371 U.S. at 484-88.

---

[10] Based on Corporal Armenteros testimony, the residents of the house did not object to his presence there; they simply wanted nothing to do with what had happened outside their house. In any event, Ragin has no standing to challenge the lawfulness of Corporal Armenteros' presence outside the house because he was neither a resident nor an overnight guest at the house. See United States v. Merricks, 572 F. App'x 753, 757 (11th Cir. 2014) (arrestee lacked standing to challenge police officers' warrantless entry onto curtilage of friend's home when arrestee was not an overnight guest nor did he have an unrestricted right of custody or control over the residence) (citing United States v. Sarda-Villa, 760 F.2d 1232, 1236 (11th Cir. 1985)).

## **RECOMMENDATION**

In accordance with the foregoing, the undersigned respectfully recommends that Ragin's Motion to Suppress be DENIED.  Pursuant to Local Magistrate Judge Rule 4(b), the parties have <u>fourteen</u> days from the date of this Report and Recommendation to file written objections, if any, with the Honorable Ursula Ungaro.  Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.  See <u>Resolution Tr. Corp. v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).

RESPECTFULLY SUBMITTED in Miami, Florida this 2nd day of May, 2016.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
United States District Judge Ursula Ungaro
Counsel of Record